**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Michelle Custer,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | |
| **Equifax Information Services, LLC, and U.S. Department of the Treasury,** | |
| **Defendants.** | |

**COMPLAINT AND JURY DEMAND**

**Preliminary Statement**

1. This is an action for damages brought by an individual consumer against the Defendants (named below) for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA").

2. Plaintiff Michelle Custer ("Ms. Custer" or "Plaintiff") paid a $421.64 medical bill owed to the federal government in February 2022, through the U.S. Department of the Treasury's ("USDT") own online payment system.

3. Four years later, Defendants began reporting that same debt as an unpaid $423 collection account. Ms. Custer disputed this information approximately five (5) different times, but Defendants continued to verify the information as accurate. Included with two of her disputes was information supporting her assertion that the information was not accurate. One of those disputes included her Navy Federal Credit Union ("NFCU") bank statement showing the payment (the "NFCU Statement") and a Pay.gov payment confirmation email (the "Pay.gov Email"). The other dispute included Ms. Custer's driver's license, her social security card, a utility bill, the Pay.gov Email, the NFCU Statement, and a July 13, 2026, Bureau of the Fiscal Service ("BFS")

email confirming that she has no active accounts (the "BFS Email").

4. Defendants ignored all of it, verified the debt as owed, and ultimately refused to investigate any further disputes. Meanwhile, the false collection account hampered Ms. Custer's candidacy for a position supporting the U.S. Department of Justice.

## Jurisdiction and Venue

5. Jurisdiction of this Court arises under 15 U.S.C. § 1681p, and 28 U.S.C. §1331, 1337.

6. The FCRA waives the sovereign immunity of the United States and its agencies, including the USDT, for claims under 15 U.S.C. §§ 1681n and 1681o. See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42 (2024).

7. Venue lies properly in this district pursuant to 28 U.S.C. §1391(b) and (e)(1)(A). Venue is proper as to the USDT, an agency of the United States, because a defendant in this action, Equifax Information Services, LLC ("Equifax"), resides in this District.

## Parties

8. Plaintiff is an adult individual who resides in Knoxville, TN.

9. Defendant Equifax is a business entity that is registered to do business in the Commonwealth of Pennsylvania and regularly conducts business in the Eastern District of Pennsylvania, with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, GA 30309. At times Equifax is referred to as the "Credit Reporting Agency Defendant" or the "CRA Defendant".

10. Defendant USDT is an executive department of the United States headquartered at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220. USDT acts in part through its BFS,

which operates the Pay.gov payment system and collects delinquent non-tax debts that other federal agencies refer to USDT.

11. USDT is a "person" as defined by 15 U.S.C. § 1681a(b), which expressly includes any "government or governmental subdivision or agency," and a "furnisher" as defined in 12 C.F.R. § 1022.41(c), as it regularly provides information relating to consumers to one or more consumer reporting agencies (also known as credit reporting agencies) ("CRAs") for inclusion in consumer reports.

## **Facts**

### **Purpose of the FCRA**

12. Understanding the dire consequences of inaccurate credit reporting, Congress enacted the FCRA. One of the primary purposes of the FCRA is to require CRAs to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

13. The preservation of one's good name and reputation is also a foundational principle of the FCRA:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly

> as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)].

14. Thus, in order to further its objectives, embedded within the FCRA is the requirement that CRAs conduct a reasonable investigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted.

15. Further underscoring the importance of accurate credit reporting, the FCRA also requires furnishers of information - a creditor or other third party that provides information about a consumer to a CRA - upon notice, to conduct a reasonable investigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

16. Here, despite Ms. Custer's numerous disputes, neither Defendant conducted a reasonable investigation of the inaccurate reporting of Plaintiff's credit information, and both continued to report derogatory, inaccurate information about her.

**Ms. Custer Paid the Alleged Debt in Full in 2022**

17. The alleged debt is for medical services that Ms. Custer received at the Naval Hospital in Naples, Italy, while living there with her husband, who was working for the military

at the time.

18. No bill was ever sent to Ms. Custer.

19. In or about February 2022, Ms. Custer learned of the outstanding amount by notification from MEGASecurity who found this information on a background investigation for Plaintiff when she was applying for a federal job.

20. After discovering the existence of the outstanding amount, Ms. Custer immediately paid the balance in full. On February 16, 2022, she paid $421.64 through Pay.gov's "Fed Debt – Public" application, USDT's own channel for collecting debts owed to the federal government, and the funds were debited from her NFCU checking account the next day.

**Defendants Reported the Paid Debt as an Unpaid Collection Account**

21. In or about early 2026, four years after Ms. Custer paid the debt, USDT began furnishing the inaccurate information, and Equifax began reporting, a "US DEPT OF THE TREASURY" collection account on Ms. Custer's Equifax credit report (the "USDT Account") showing a balance of $423, all of it past due.

22. The USDT Account is inaccurate on its face. It reports a $423 balance that Ms. Custer does not owe and a collection status for a debt she paid in full. It is also internally inconsistent: it reports a "High Credit" of $324 but a larger balance of $423; a "Date Opened" of February 10, 2026, but a "Date of 1st Delinquency" of September 1, 2021.

23. The USDT Account should never have appeared on Ms. Custer's report in any event. In approximately 2022, Equifax and the other nationwide CRAs publicly committed to stop reporting paid medical collection debt and medical collection debt under $500. The USDT Account is both.

24. Ms. Custer has called USDT approximately seventeen times about the USDT

Account. Each time, USDT confirmed that the debt was paid and its file closed in 2022 but said it cannot provide proof of payment because the account is more than eighteen months old.

25. BFS also confirmed in writing, by secure email dated July 13, 2026, that Ms. Custer has no active accounts with it.

26. The Defense Health Agency, to which the debt was originally owed, and the Department of Defense likewise confirmed that they have no record of any outstanding debt in Ms. Custer's name.

27. Nevertheless, Equifax and the USDT continued to report the USDT Account as a collection account with a balance.

28. Between January and August 2026, Ms. Custer disputed the USDT Account with Equifax five times. Defendants verified the inaccurate information four times, and the fifth time Equifax refused to investigate. Additionally, Equifax failed to note that the USDT Account was disputed following her first dispute.

**Ms. Custer's Extensive Disputes with Equifax**

29. On or about January 23, 2026, Ms. Custer disputed the inaccurate reporting with Equifax by telephone.

30. By correspondence dated February 10, 2026, Equifax responded by claiming that the inaccurately reported USDT Account was verified as accurate and the inaccurate credit reporting continued.

31. On or about June 3, 2026, Ms. Custer disputed the inaccurate reporting with Equifax stating that she had paid the original creditor and that the account status was incorrect. She included her NFCU Statement and the Pay.gov Email.

32. By correspondence dated June 23, 2026, Equifax responded by claiming that the

inaccurately reported USDT Account was verified as accurate and the inaccurate credit reporting continued.

33. On or about June 24, 2026, Ms. Custer disputed the inaccurate reporting with Equifax by telephone, explaining that the account should carry no balance.

34. By correspondence dated July 9, 2026, Equifax responded by claiming that the inaccurately reported USDT Account was verified as accurate and the inaccurate credit reporting continued.

35. On or about July 13, 2026, Ms. Custer disputed the inaccurate reporting with Equifax by telephone, explaining that the debt had already been paid and, as a medical debt under $500, should not be reported at all.

36. By correspondence dated July 29, 2026, Equifax responded by claiming that the inaccurately reported USDT Account was verified as accurate and the inaccurate credit reporting continued.

37. By letter dated August 26, 2026, and sent by certified mail on August 31, 2026, Ms. Custer again disputed the inaccurate reporting with Equifax. The dispute included a detailed explanation as to why the information being reported was inaccurate, false and misleading. The dispute also included: Ms. Custer's driver's license, her social security card, a utility bill, the Pay.gov Email, the NFCU Statement, and the July 13, 2026, BFS email confirming that she has no active accounts (the "BFS Email").

38. By correspondence dated September 8, 2026, Equifax responded by stating that it closed its investigation regarding the USDT Account due to the "Item(s) disputed at least twice within the last 90 days and previously verified as accurate". Equifax refused to investigate the account even though new and additional information and documentation was provided to it,

including the BFS Email, which Equifax had never before received. The FCRA permits a CRA to decline to reinvestigate only a dispute that it reasonably determines to be frivolous or irrelevant, 15 U.S.C. § 1681i(a)(3), and Ms. Custer's thoroughly documented dispute was neither.

39. Equifax's dispute results represented that, as the FCRA requires, Equifax "contacted the company reporting the disputed information"—USDT—and "provided them with any relevant information and supporting documentation." See 15 U.S.C. § 1681i(a)(2). Upon information and belief, USDT received notice of each of Ms. Custer's first four disputes from Equifax and, each time, verified the inaccurate information without conducting any meaningful investigation.

40. Ms. Custer takes significant pride in her credit, and was distraught, confused and upset by Defendants' failure to remove the inaccurate credit information included within her credit report despite the documentation she submitted and by Equifax refusing to further investigate the inaccurate information.

**The Inaccurate Reporting Derailed Ms. Custer's Employment Prospects**

41. In May and June 2026, Ms. Custer was a finalist for a paralegal position with CACI, Inc.–Commercial ("CACI"), a government contractor, supporting the U.S. Department of Justice. After two interviews, CACI told Ms. Custer that she was one of two candidates it would present to the U.S. Attorney's Office.

42. On June 2, 2026, CACI notified Ms. Custer in writing that it had obtained her Equifax credit report, that the report showed the USDT Account as "Past Due: $423," and that this adverse item had to be addressed before CACI could submit her application to its government client. CACI warned that if the item was disputed, "the dispute must complete and resolve before your candidacy can progress."

43. Because Defendants refused to correct the USDT Account, Ms. Custer could not satisfy CACI's requirement, and her candidacy did not progress.

44. Ms. Custer also applied for a Legal Assistant position with the U.S. Attorney's Office for the Eastern District of Tennessee, whose hiring process included a credit check. On July 29, 2026, after she had interviewed for the position, she was informed that another candidate had been selected.

**Defendants' Failure to Conduct Reasonable Investigations**

45. Ms. Custer's disputes triggered obligations under the FCRA for Equifax (Section 1681i(a)) and USDT (Section 1681s-2(b)) to conduct reasonable investigations.

46. This dual investigative requirement further illustrates and reinforces Congress' findings of the importance of accurate consumer credit reporting. Unfortunately, however, when conducting an 'investigation' CRAs and furnishers choose speed over accuracy.

47. Furnishers merely review information in their limited credit reporting databases to determine if the disputed information is accurate. CRAs then simply accept as true whatever representation is made by the furnisher without questioning any of the results, or conducting a true independent investigation. Furnishers and CRAs alike often simply ignore documentation provided to them by consumers that is intended to assist in resolving a disputed inaccuracy.

48. In other words, no true investigation is performed by CRAs or furnishers other than a perfunctory data match of information. See e.g., Robertson v. J.C. Penney Co., 2008 WL 623397, at *8 (S.D. Miss. Mar. 4, 2008) ("There appears to have been no investigation of the disputed status of the claim at all"); Wood v. Credit One Bank, 277 F. Supp. 3d 821 (E.D. Va. 2017) (granting summary judgment; in response to six disputes "Credit One did nothing more than verify each time that Wood's personal information on the ACDVs matched his personal information on

the Account"); Scharf v. Trans Union, LLC, 2015 WL 6387501 (E.D. Mich. Oct. 22, 2015), reconsideration denied, 2015 WL 7016331 (E.D. Mich. Nov. 12, 2015) (granting summary judgment where the furnisher merely reviewed its file to determine whether the loan was in default); Marchisio v. Carrington Mortg. Servs., LLC, 919 F.3d 1288, 1303 (11th Cir. 2019) ("…Defendant made no correction nor any effort to insure that the pertinent databases revealed the existence of the settlement and the fact that no debt was owed by Plaintiffs. Meaning that when Plaintiffs took the predictable next step of disputing this debt with the credit reporting agencies, the outcome of the investigation by Defendant's employee was also quite predictable: the employee would incorrectly verify the existence of a continuing debt.")

49. Unfortunately, this situation is no different.

50. Ms. Custer provided with her disputes all of the information and documentation necessary to confirm that the account was paid in full. Additionally, any reasonable inquiry into this matter would have further confirmed that the reporting of the credit information was not accurate.

51. USDT's failure is especially inexcusable. USDT did not need to look beyond its own records: it processed Ms. Custer's payment through its own Pay.gov system; its own BFS confirmed in writing that she has no active accounts; and its own representatives told her roughly seventeen times that the debt had been paid. Yet each time it received notice of her dispute, USDT verified the debt as owed.

52. If any reasonable investigation were conducted, and the materials submitted by Ms. Custer were read, the USDT account should have been corrected or deleted.

53. Defendants either did not engage in any investigation when they were informed of the inaccurate reporting, or (alternatively) did not engage in a reasonable investigation, as such an

investigation would have revealed the inaccurate information, which, at minimum, was misleading since Ms. Custer provided documentation confirming that her account was paid in full.

54. Defendants failed to institute or adhere to policies and procedures that could have prevented the reporting of the inaccurate information.

55. Defendants knew or should have known that their actions violated the FCRA. Additionally, Defendants could have taken the steps necessary to bring their agents' actions within compliance of the statutes but neglected to do so and failed to adequately review those actions to ensure compliance with said laws.

56. Plaintiff's credit reports and file have been obtained from the CRA Defendant and have been reviewed by prospective and existing credit grantors and extenders of credit, as well as by a prospective employer, and the inaccurate information has been a substantial factor in precluding Plaintiff from receiving credit offers and opportunities, known and unknown.

57. As a result of Defendants' violations of the law, Ms. Custer suffered lost employment opportunities, interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, fear, worry, anxiety, and embarrassment attendant to her disputes and disbelief by Defendants of her assertions.

## Count One – Violations of the FCRA
## Plaintiff v. Equifax

58. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

59. At all times pertinent hereto, Equifax is a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

60. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by

15 U.S.C. § 1681a(c).

61. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

62. The CRA Defendant has violated numerous provisions of the FCRA for its improper actions, including but not limited to Sections 1681e(b) and 1681i(a) of the FCRA. Defendant willfully and negligently violated the FCRA and is liable for damages to Plaintiff pursuant to Section 1681n and 1681o of the FCRA.

63. Among other things, Equifax violated Section 1681i(a) by failing to conduct reasonable reinvestigations of Ms. Custer's disputes, failing to review and consider all relevant information she submitted, and refusing to reinvestigate her August 2026 dispute without any lawful basis to deem it frivolous or irrelevant.

64. The conduct of Defendant was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Defendant is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

**Count Two – Violations of the FCRA**

**Plaintiff v. USDT**

65. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

66. At all times pertinent hereto, USDT was a "person" as that term is defined by 15 U.S.C. § 1681a(b).

67. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

68. USDT violated Section 1681s-2(b) of the FCRA by engaging in the following conduct:

a. willfully and negligently failing to conduct a reasonable investigation of the inaccurate information that Plaintiff disputed;

b. willfully and negligently failing to review all relevant information concerning Plaintiff's inaccurately reported tradeline, including USDT's own records of her payment;

c. willfully and negligently failing to report the results of its investigations to the relevant CRAs;

d. willfully and negligently failing to report the accurate status of the inaccurate information to all CRAs;

e. willfully and negligently failing to modify, delete, or permanently block the reporting of information it knew or should have known was inaccurate, incomplete, or unverifiable;

f. willfully and negligently continuing to furnish and disseminate inaccurate, unlawful and derogatory credit account and other information concerning Plaintiff to CRAs and other entities; and

g. willfully and negligently failing to comply with the requirements imposed on furnishers of information pursuant to 15 U.S.C. § 1681s-2(b).

69. USDT has violated numerous provisions of the FCRA for its improper actions, including but not limited to Section 1681s-2(b) of the FCRA. USDT willfully and negligently violated the FCRA and is liable for damages to Plaintiff pursuant to Sections 1681n and 1681o of the FCRA.

70. The conduct of USDT was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff that are outlined more fully above. As a result, USDT is liable to Plaintiff for the full amount of statutory, actual, and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief as may be permitted by law.

**JURY TRIAL DEMAND**

71. Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendants, based on the following requested relief:

h. Actual damages;

i. Statutory damages;

j. Punitive damages;

k. Costs and reasonable attorneys' fees; and

l. Such other relief as may be necessary, just and proper.

**THE KIM LAW FIRM, LLC**

BY: */s/ Richard H. Kim*

Richard Kim, Esquire
1515 Market St., Suite 1200
Philadelphia, PA 19102
Ph. 855-996-6342/Fax 855-235-5855
rkim@thekimlawfirmllc.com

*Attorney for Plaintiff Michelle Custer*

Date: October 2, 2026